**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. DKC-19-257** |
| | * | |
| **RICHARD TINGLER,** | * | |
| **DAVID GOLLAHON, and** | * | |
| **RICHARD ADAMS** | * | |
| | * | |
| **Defendants.** | | |

********\*

**GOVERNMENT'S CONSOLIDATED RESPONSE
TO DEFENDANT'S PRE-TRIAL MOTIONS**

The United States of America respectfully submits this consolidated response to the motions filed by Defendants Richard Tingler, David Gollahon, and Richard Adams in this matter, which arises out of Defendants' armed robberies of a PNC Bank and M&T Bank in Baltimore, Maryland on January 23, 2019 and February 1, 2019, respectively. For the reasons that follow, the Court should deny the motions.

**FACTUAL BACKGROUND**

**I.      Robbery Of The PNC Bank.**

On January 23, 2019, Adams drove Tingler and Gollahon to the area of the PNC Bank, located at 3600 Boston Street, Baltimore, Maryland 21224 in a gray Hyundai Accent car that Adams had rented two weeks earlier. Tingler and Gollahon each had a firearm, and at approximately 2:17 PM, Tingler and Gollahon entered the PNC Bank.

Tingler wore a black ski mask, gray gloves, and a camouflage jacket; he carried a loaded black .45 caliber Sig-Sauer firearm. He also carried a black leather duffel bag. Gollahon wore a black ski mask and a gray hooded sweatshirt; he had a black glove on one hand and carried a loaded black .380 caliber Ruger firearm.

After entering the bank, Tingler and Gollahon told everyone to put their hands up. Tingler

1

approached the victim teller, pointed his firearm at her and demanded $100 dollar bills and loose bills from the bottom drawer of the till.  Meanwhile, Gollahon held the other bank employees and customers at gunpoint in the lobby area of the bank.

The victim teller complied with Tingler's demand for cash and handed over $7,531.00 dollars in United States currency.  Tingler and Gollahon then fled the bank on foot.  As they ran through a parking lot adjacent to the bank, they accidentally dropped approximately $5,584 in cash.  They then got into the gray Hyundai Accent car driven by Adams, who had been waiting for them.  Adams, Tingler, and Gollahon then fled in the car.

## II.     Robbery Of The M&T Bank And The Arrest Of Defendants.

About a week later, on February 1, 2019, Adams drove Tingler and Gollahon to the area of the M&T Bank, located at 2934 O'Donnell Street Baltimore, Maryland 21224 in a 2006 Chevy Monte Carlo car with Maryland registration 3DM9640, which was registered to and belonged to Adams.  Tingler and Gollahon each had the same firearm each had used in connection with the January 23, 2019 robbery of the PNC Bank.  At approximately 11:49 AM, Tingler and Gollahon entered the M&T Bank.

Tingler's face was covered and he wore a black beanie, gray gloves, and the same camouflage jacket that he wore during the PNC robbery; he again carried a loaded black .45 caliber Sig-Sauer firearm.  Gollahon's face was covered and he wore a dark colored hoodie and a blue and tan jacket colored jacket.  He wore black gloves and again carried a loaded black .380 caliber Ruger firearm.

Tingler and Gollahon approached the teller window.  Tingler pointed his firearm at the teller and demanded $100 bills, stating "I'm not playing bitch.  Give me hundreds."  The victim teller complied and handed over cash from the till.  But Tingler continued to demand more money.  At the same time, Gollahon approached the teller line with his firearm pointed in the direction of

the tellers and bank customers.

In response to the demands for more cash, the victim teller and a co-worker went to the bank's vault and removed $40,000 in cash. They provided that cash to Tingler and Gollahon, who ultimately were given $43,802.00 in cash total. In addition to the cash, the victim teller also included a GPS tracker, which was activated and began transmitting its location every two seconds.

Tingler and Gollahon then fled the bank and got into Adams' 2006 Chevy Monte Carlo car driven by Adams, who was waiting for them. Adams then drove the Monte Carlo away from the bank. A Baltimore Police Department (BPD) officer soon began receiving the GPS information from the tracker and began relaying it over the radio to BPD units. Baltimore County police units were also alerted. Law enforcement also received a general description of the robbers that had been provided to them from 911 callers, which was also relayed over the radio: One robber was described as being a #2 (*i.e.*, white) male, wearing dark clothes, a ski mask, having blue eyes, being tall, and being armed with a gun; and another male was with him.

In the minutes that followed, BPD units continued to receive real-time GPS location information and were eventually advised that the GPS tracker was stationary at the intersection of Diamond Point Road and Eastern Avenue in Essex, Maryland (Baltimore County). Law enforcement observed three vehicles at the same intersection, which were headed in the same direction as the tracker. Moments later, units were advised that the GPS tracker was again in motion and that it had turned off of Eastern Avenue onto Virginia Avenue. Units observed only one of the three vehicles turn onto Virginia Avenue—Mr. Adams' gray 2006 Chevy Monte Carlo—confirming that the GPS tracker was in the vehicle.

At approximately 12:02 PM, less than 15 minutes after the robbery, BPD officers stopped the Monte Carlo. Adams, Tingler, and Gollahon were ordered out of the vehicle by the officers (who had drawn their firearms), handcuffed, and detained. Responding officers frisked Defendants

for weapons.  Gollahon had a .380 caliber Ruger—the same firearm he used during the robbery—in the front right pocket of his coat.  All three Defendants were eventually arrested and transported to the BPD Citywide Robbery Office.

### III.    Defendants' Statements To Law Enforcement.

Once there, after voluntarily waiving his *Miranda* rights verbally and in writing, Ex. 1 (Adams Statement); Ex. 2 (Adams *Miranda* Waiver), Adams, among other things (1) admitted that he was the getaway driver in connection with the January 23, 2019 PNC Bank and February 1, 2019 M&T Bank robberies; (2) stated that Tingler and Gollahon were the ones who committed the robberies; and (3) identified Tingler and Gollahon in surveillance footage from the February 1, 2019 robbery.

Adams also provided law enforcement verbal and written consent to search his 2006 Monte Carlo car and his residence located at 39 Terrace Road in Essex, Maryland.  Ex. 3 (Adams Consent To Search Form).

Gollahon also provided a statement to investigators.  Ex. 4 (Gollahon Statement). After voluntarily waiving his *Miranda* rights, Ex. 5 (Gollahon *Miranda* Waiver), Gollahon, among other things, (1) admitted that he and Tingler committed the January 23, 2019 PNC Bank and February 1, 2019 M&T Bank armed robberies; (2) identified himself and Tingler in bank surveillance images; and (3) stated that Adams served as the getaway driver in connection with both robberies.

Tingler also spoke with investigators after voluntarily waiving his *Miranda* rights. Ex. 6 (Tingler Statement); Ex. 7 (Tingler *Miranda* Waiver).  Tingler provided routine booking information such as his name, address, and phone number to investigators.  But he ultimately declined to speak with investigators concerning the robberies and asked to speak with a lawyer.

### IV.    The Consent Searches Of Adams' Monte Carlo And Residence.

Law enforcement searched Adams' 2006 Monte Carlo and located in the vehicle's front

floor board a blue bag containing $43,802.00 in cash, the GPS tracker taken during the robbery, and the Sig-Sauer firearm carried by Tingler during both bank robberies.

Law enforcement also searched Adams' residence located at 39 Terrace Road in Essex, Maryland.  There they seized (1) a gray hooded sweatshirt identical in appearance to the sweatshirt worn by Gollahon during the January 23, 2019 robbery; and (2) the black leather duffel bag carried by Tingler during the January 23, 2019 robbery.

## PROCEDURAL HISTORY

On May 22, 2019, a Grand Jury sitting in the District of Maryland returned a six count indictment charging:  (1) Defendants with two counts of Armed Bank Robbery in violation of 18 U.S.C. §§ 2113(a), (d) (Counts One and Three); (2) Defendants with two counts of Brandishing a Firearm During a Crime of Violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Counts Two and Four); and (3) Gollahon and Tingler each with being a Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1) (Counts Five and Six).

On December 20, 2019, each of the Defendants filed various pre-trial motions, which are summarized in the following chart:

| MOTION | DEFENDANT | ECF. # |
|---|---|---|
| **SUPPRESSION MOTIONS** | | |
| Motion To Suppress Evidence Obtained Following Warrantless Stop And Search | Tingler | 58 |
| Motion To Suppress Evidence Obtained After Warrantless Search of Residence | Tingler | 59 |
| Motion to Suppress Statements | Gollahon[1] | 60 |
| Motion To Suppress Evidence | Adams[2] | 62 |

---

[1] Gollahon has also moved to adopt "all pertinent motions" of his co-Defendants.  ECF No. 61.

[2] All of Adams' motions should be denied as moot in light of Adams' guilty plea and waiver of his right to file all motions.  *See* Ex.  7 (Adams Plea Agreement).

| Motion to Suppress Statements | Adams | 63 |
| **OTHER PRETRIAL MOTIONS** | | |
| Motion To Sever Felon in Possession Count | Tingler | 56 |
| Motion to Sever Defendants | Tingler | 57 |
| Motion To Adopt Motions Filed By Co-Defendants | Adams | 65 |
| Motion for Leave to File Additional Motions | Adams | 66 |
| **DISCOVERY MOTIONS** | | |
| Motion for Disclosure Pursuant to Rules 404(b) and 609 | Adams | 64 |

On January 17, 2020, the Court accepted Defendant Adams' guilty plea to Counts One and Two of the Indictment.  Sentencing is scheduled for April 24, 2020.

A motions hearing is scheduled for March 20, 2020 at 9:30 a.m. and a two-week jury trial is scheduled for June 1, 2020.

## ARGUMENT

All of Defendant's motions are either meritless, moot, or premature, and therefore the Court should deny them.

## I.     The Motion To Suppress Based On The Stop Of The Getaway Vehicle Should Be Denied (ECF No. 58).

Tingler first argues that the stop of the Monte Carlo that was occupied by Adams, Tingler, and Gollahon as they were fleeing the M&T bank they had robbed just minutes earlier lacked "probable cause or reasonable suspicion."  ECF No. 58 at 3.[3]  He is wrong.  Law enforcement's real-time tracking of the GPS tracker taken from the M&T Bank immediately after the armed bank robbery and their identification of Adams' 2006 Monte Carlo—which had three white males in it—as the getaway vehicle containing the tracker provided ample reasonable suspicion to stop the Monte Carlo and to detain Defendants.  And, after that detention, there was more than probable

---

[3] Defendant Gollahon has moved to adopt this motion.  ECF No. 61.

cause to arrest them.  Indeed, during the frisk of Gollahon after the stop, law enforcement discovered a firearm—the same firearm he had used minutes earlier during the robbery.

Stopping a car and detaining its occupants is a "seizure" and, therefore, is subject to protections of the Fourth Amendment, including a requirement of reasonableness under the circumstances. *United States v. Hensley*, 469 U.S. 221, 226 (1985).  Police may perform an investigatory stop of a person when they have a reasonable, articulable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 30 (1968).  The reasonable suspicion standard requires more than a "mere hunch," but "considerably less" and "obviously less" information than probable cause. *See Navarette v. California*, 134 S. Ct. 1683 (2014).  The determination whether there is reasonable suspicion is governed by the totality of the circumstances, and includes not only information known to an officers, but reasonable inferences that may be drawn from the facts and circumstances. *United States v. Arvizu*, 534 U.S. 266 (2002).

This inquiry involving "a common-sense proposition" that involves "crediting the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993).  Reasonable suspicion cannot be defined into a "neat set of legal rules," but rather it is "a commonsense, nontechnical conception that deals with the factual and practical considerations of everyday life." *Id.* at 154.  An investigative detention does not become an arrest merely because the person being detained is not free to leave. *United States v. Hamlin*, 319 F.3d 666, 671-72 (4th Cir. 2003).

Further, once a vehicle is properly stopped, officers are permitted to remove passengers from the vehicle. *Maryland v. Wilson*, 519 U.S. 408, 415 (1997).  And a police officer may conduct a pat-down search of an individual stopped in a *Terry* situation if he has a reasonable, articulable suspicion that the person is involved in illegal activity and is armed. *United States v. Raymond*, 152 F.3d 309, 312 (4th Cir.1998).  The standard justifying such a pat-down search is not onerous.

*United States v. Swann*, 149 F.3d 271, 274 (4th Cir.1998).

Finally, warrantless arrests are permitted where there is probable cause to believe a felony is being or has been committed by the arrested individual, based upon "the totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983).

Here, there was more than reasonable suspicion to justify a *Terry* stop of the getaway vehicle and the frisks of Defendants after law enforcement directed them to get out of the car.  For starters, the stop of the vehicle and pat down searches of Defendants took place in the immediate aftermath of an armed bank robbery, which law enforcement knew had been committed by two men—at least one of whom was white.  Police stopped the Monte Carlo—containing a driver and two other white men—about 15 minutes after the robbery took place and about six miles away from the location of the robbery.

Law enforcement initiated that stop after using real-time information, in the form of data from a GPS tracker that Tingler and Gollahon had unwittingly taken from the bank during the robbery and which was relayed to law enforcement over the radio, to identify the vehicle containing the GPS tracker—the Monte Carlo—which had three white men in it.  Relying on the real-time tracking data, officers proceeded along the path of the tracker, and eventually, came to a red light near the intersection of Eastern Boulevard and Diamond Point Road in Essex, Maryland. An officer observed the gray Monte Carlo, occupied by Adams, Tingler, and Gollahon.  The GPS showed no movement once the Monte Carlo stopped, which caused officers to understand that the GPS tracker was potentially inside the vehicle.  Law enforcement continued to track the Monte Carlo as it continued down Eastern Avenue and eventually turned onto Virginia Avenue.  The car's location continued to be consistent with that of the tracker, which confirmed law enforcement's earlier suspicion that the tracker was inside the Monte Carlo.  Law enforcement continued to track the Monte Carlo and eventually stopped the vehicle a few blocks away at the

corner of Riverside Drive and Eastern Boulevard.  They drew their weapons, ordered Defendants of the out of the vehicle, and handcuffed them.

The stop of the Monte Carlo—and the subsequent frisk and detention of each of its passengers—was justified and reasonable under the circumstances.  Indeed, the detention was proper in light of the ongoing criminal investigation concerning the armed bank robbery that had occurred just minutes earlier.  It is well-settled that law enforcement may carry out investigative detentions in the course of an ongoing investigation and may detain an individual where, as here, an individual is suspected of committing a felony.  *See, e.g.*, *Hensley*, 469 U.S. at 227 (holding that an officer has the authority to make a *Terry* stop "when [he] has reasonable, articulable suspicion that the person *has been*, is, or is about to be engaged in criminal activity" and concluding that an investigative stop of person suspected of driving getaway car in robbery was lawful (quoting *United States v. Place*, 462 U.S. 696, 702 (1983))).

Further, the handcuffing and frisks of Defendants was proper on the grounds of officer safety given that two firearms were brandished during the robbery and the fact that law enforcement had every reason to believe those firearms were still in the car they had just stopped. *See, e.g.*, *United States v. Diriye*, No. Cr. 14-236 JNE/TNL, 2014 WL 6775288, at *4 (D. Minn. Dec. 2, 2014) ("[I]t was not unreasonable for law enforcement to handcuff Defendant during the investigatory stop given the suspected use of a gun in the robbery they were investigating and the fact that law enforcement had not yet been able to clear the car (including removing any weapons present)."); *United States v. Davis*, 533 F. App'x 576 , 579 (6th Cir. 2013) (unpublished) (officers may take reasonable precautions, including displaying weapons and using handcuffs without exceeding bounds of *Terry* stop so long as warranted by the facts).

Indeed, law enforcement here knew that (1) an armed bank robbery in which two firearms were brandished had occurred about 15 minutes earlier and just a few miles from their position,

9

(2) a GPS device was tracking the robbers to their location, (3) they were looking for at least two males (at least one of whom was white); (4) three white males were driving a vehicle into the intersection of Eastern Boulevard and Diamond Point Road; (5) the vehicle had become stationary once the car with the white males in it were at a red light at the intersection; (6) the GPS tracker was stationary at the same location at the same time; (7) the vehicle then continued on Eastern Boulevard and made a right hand turn on to Virginia Avenue; and (8) the turn on to Virginia Avenue was consistent with the GPS information of the tracker.

These facts were more than sufficient to justify the stop of the vehicle and the frisk of its passengers for weapons. *See, e.g.*, *United States v. Garraud*, 434 F. App'x 132, 136 (3d Cir. 2011) (per curiam) (reasonable suspicion existed to stop vehicle based on consistency of GPS data from tracker pack taken from bank during robbery and the fact that the race of the driver of the vehicle matched that of the robber); *United States v. Gonzalez*, 311 F. App'x 955, 956 (9th Cir. 2009) (unpublished) (police had reasonable suspicion to stop, detain, and frisk driver and passenger of a vehicle that was identified as possibly involved in an armed robbery based on the signal from a tracking device taken during the robbery where the passenger matched the general description of the robber).

What's more, the Fourth Circuit has affirmed denials of motions to suppress arising out of traffic stops with subsequent frisks, following robberies where law enforcement had far less information at hand when they initiated the stop than the officers did here. *See United States v. Banks*, 188 F. App'x 217, 218-19 (4th Cir. 2006) (unpublished) (stop of car, removal of passengers at gunpoint, and frisk of passengers justified where officers had no indication that car was used in earlier armed robbery but based stop on very general description of the robbers (two black males with at least one in dark clothing) and fact that the vehicle in question had no front license plate and a fraudulent Maryland tag); *United States v. Garcia*, 118 F. App'x 690, 691-93 (4th Cir. 2004)

(unpublished) (traffic stop following robbery justified based on the fact that the car was in an area that someone fleeing the robbery may pass through, the car was beat up and out of place in a nice neighborhood, the car took an indirect path, and the occupants fit very general descriptions of robbers); *United States v. Monroe*, 396 F. App'x 33, 36-37 (4th Cir. 2010) (unpublished) (officer justified in initiating traffic stop of vehicle traveling from direction of robbery where suspect description matched and general vehicle description matched even though the wrong vehicle model was conveyed).

Furthermore, after the Defendants were detained and frisked, law enforcement recovered a firearm in Gollahon's coat pocket—further confirming that he and the others in the car were involved in the armed robbery that had occurred just minutes earlier.[4]  In light of all of this information—the temporal and geographic proximity of the vehicle and its occupants to the bank robbery, the real-time GPS tracker information which corresponded exactly to the location of the Monte Carlo, the appearance of the occupants of the vehicle which matched the available description of the armed robbers, and the fact that a firearm was recovered during the frisk of Gollahon—there was a more than sufficient basis for law enforcement to make warrantless arrests of Defendants for the robbery of the M&T Bank.

At bottom, there is simply no factual basis for the assertion that law enforcement lacked either reasonable suspicion to stop the Monte Carlo or probable cause to arrest Tingler and Gollahon.  Accordingly, the purported justification for suppression fails, and the motions should be denied.

---

[4] Tingler and Gollahon were still wearing the clothing they wore during the robbery. Further, a subsequent search of the vehicle pursuant to Adams' consent, as detailed in the section just below, yielded the handgun used by Tingler during the robbery, a bag containing the more than $40,000 from the robbery, and the GPS tracker that police had used to locate the Monte Carlo.

**II.     The Consent Search Of The Terrace Road Residence Was Valid (ECF No. 59).**

Defendant Tingler next moves to suppress all tangible and derivative evidence seized during the consent search of Adams' residence located at 39 Terrace Road in Essex, Maryland. ECF No. 59.  Defendant Gollahon has moved to adopt this motion.  ECF No. 61.  While Tingler's motion cites various cases for the legal framework governing consent searches, there is no factual basis or argument supporting the conclusory assertion that "[t]he defense denies that this consent was voluntarily granted."  *Id.* at 3.  This motion is meritless, because Adams knowingly and voluntarily gave consent, including by signing a written consent form, after *Miranda* warnings were issued to him.  *See* Ex. 2 (Adams *Miranda* Waiver); Ex. 3 (Adams Consent To Search Form).

It is well established that "certain categories of permissible warrantless searches have long been recognized," such as "consent searches." *Fernandez v. California*, 571 U.S. 292, 298 (2014). Consent to search is valid only if it is "(1) knowing and voluntary, and (2) given by one with authority to consent." *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007) (citations and internal quotation marks omitted).  And "[a]s long as the facts available to the officer at the moment warrant a person of reasonable caution in the belief that the consenting party had authority, apparent authority to consent exists." *Id.* at 555 (internal quotation marks and alterations omitted).

"[W]hether a consent to a search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) (internal quotation marks omitted).  The government bears the burden of proving that consent was voluntarily given by a preponderance of the evidence, and the court assesses voluntariness based on the totality of the circumstances.  *E.g.*, *Buckner*, 473 F.3d at 553-55.  "Written consent supports a finding that consent was voluntary." *United States v Boone*, 245 F.3d 352, 362 (4th Cir. 2001).

Here, there is no question that the consent to search provided by Adams was voluntary.  In

fact, this Court has heard Adams acknowledge under oath that he voluntarily consented to the search of his residence at 39 Terrace Road and his Monte Carlo.  On January 16, 2020, Adams pleaded guilty to one count of aiding and abetting bank robbery and one count of aiding and abetting the brandishing of a firearm in furtherance of a crime of violence. Ex. 8 (Adams Plea Agreement) (ECF No. 71) at 1-2.  And during that guilty plea proceeding, this Court accepted the government's proffer of facts, as jointly stipulated to within the plea agreement letter, which Adams acknowledged were true and accurate.  Among other things, Adams admitted under oath to this Court that he voluntarily waived his *Miranda* rights and that he (1) "provided law enforcement verbal and written consent to search his 2006 Monte Carlo car" and (2) "also provided law enforcement verbal and written consent to search his residence located at 39 Terrace Road in Essex, Maryland." *Id.* at 12.

Moreover, as Adams' statement to law enforcement makes plain, he gave full consent to search both the Monte Carlo used during the February 1, 2019 bank robbery at the M&T bank and his residence located at 39 Terrace Road *after* he had been Mirandized and signed a form acknowledging he understood his *Miranda* rights.  Ex. 3 (Adams Consent To Search Form); Ex. 1 (Adams Statement) at 12:00 (*Miranda* warnings issued); *id.* at 45:30 (consent given for searches).

Federal Bureau of Investigation Special Agent Krajnak explained the contents of the waiver form that Adams signed to Adams out  loud (including that it would permit the search of the residence and the Monte Carlo) and explained to Adams that he had the right to refuse consent to search and that any waiver had to be voluntary.  Adams knowingly and voluntarily consented to both searches, just as he acknowledged under oath during his Rule 11 proceeding.  The form that Adams signed listed with specificity the "Residence" at "39 Terrace Road" and had Adams explicitly affirm:  (a) "I have been advised of my right to refuse consent"; (b) "I give my permission voluntarily"; (3) "I authorize these agents to take any items which they determine may be related

to their investigation." Ex. 3 (Adams Consent To Search Form).  Adams' written consent strongly supports a finding of consent.  *See Boone*, 245 F.3d at 362-63 (affirming validity consent given by defendant where defendant signed a consent form stating that he was giving permission freely and voluntarily and had been advised of his right to refuse).  Nor are there any characteristics of Adams such as age, maturity, education, intelligence, and experience, that suggest that his consent was involuntary.  And nothing about the circumstances under which his consent was given demonstrate as much either.

Finally, even assuming that Tingler and Gollahon can establish a legitimate interest of privacy in Adams' residence at 39 Terrace Road, *see Minnesota v. Carter*, 525 U.S. 83, 89 (1998) (a person "may have a legitimate expectation of privacy in the house of someone else"), neither were present objectors at the time that Adams knowingly and voluntarily consented to the search, s*ee, e.g.*, *United States v. Shrader*, 675 F.3d 300, 305-08 (4th Cir. 2012) (consent given by defendant's aunt to search residence valid even though defendant had earlier given express refusal to search the same because defendant-objector must be physically present to eviscerate valid third-party consent (citing *Georgia v. Randolph*, 547 U.S. 103, 120 (2006)); *Fernandez*, 571 U.S. at 294 ("Our opinion in *Randolph* took great pains to emphasize that its holding was limited to situations in which the objecting occupant is physically present.").  The Court should thus deny Defendants' motions.

## III.    Motion To Sever Felon-in-Possession Counts (ECF No. 56).

Defendant Tingler next moves under Fed. R. Crim. P. 14 to sever Count Six from the Indictment, claiming that he "would be prejudiced were the jury to learn that he has been previously convicted of a felony offense."  ECF No. 56 at 2.  Defendant Gollahon has moved to adopt this motion.  ECF No. 61.  These motions should be denied.

### A.  Joinder Was Proper Under Rule 8(a).

As an initial matter, Count Six is properly joined under Fed. R. Crim. P. 8(a).  Tingler does not argue to the contrary.  Federal Rule of Criminal Procedure 8(a) provides that "[t]he indictment … may charge a defendant in separate counts with [two] or more offenses if [1] the offenses charged … are of the same or similar character, … [2] are based on the same act or transaction, or [3] are connected with or constitute parts of a common scheme or plan."  The Fourth Circuit has interpreted the latter two prongs of this rule flexibly, requiring that the joined offenses have a "logical relationship" to one another.  *United States v. Hirschfeld*, 964 F.2d 318, 323 (4th Cir. 1992). Rule 8(a) "permit[s] very broad joinder" because of the efficiency in trying the defendant on related counts in the same trial.  *United States v. Mackins*, 315 F.3d 399, 412 (4th Cir. 2003); *see also United States v. Cardwell*, 433 F.3d 378, 385 (4th Cir. 2005) (further noting that Rule 8(a) permits "very broad joinder because of the efficiency in trying the defendant on related counts in the same trial") (citation omitted); *Cataneo v. United States*, 167 F.2d 820, 823 (4th Cir. 1948) (noting that "transaction" is "a word of flexible meaning" which may encompass "a series of many occurrences, depending not so much on the immediateness of their connection, but upon their logical relationship."); *United States v. Stokes*, 211 F.3d 1039, 1042 (7th Cir. 2000) ("[C]ourts … have a strong interest in favor of joinder of offenses; in particular, joinder of offenses reduces the waste of precious judicial and prosecutorial time in the already overburdened federal judicial system and reduces the burdens on witnesses from testifying at multiple trials.").

This standard is easily satisfied here as Count Six—Tingler's Felon in Possession charge—is "based on the same act or transaction, [and is] connected with or constitute[s] parts of a common scheme or plan." Fed. R. Crim.P. 8(a).  Indeed, the firearm referenced in Count Six is directly connected to the other charges against Tingler:  He used the firearm during the armed bank robberies charged in Counts One and Three, and he brandished it during the robberies, as charged

in Counts Two and Four.  What's more, the Indictment charges Tingler with possessing the firearm on February 1, 2019, the same day as the M&T Bank robbery, and the firearm was recovered from the getaway car that was stopped by law enforcement shortly after the robbery itself.  Tingler's possession of the firearm is based on the same act or transaction (his possession and use of the firearm in connection with the M&T Bank robbery) and was part of a common scheme or plan (his use of the firearm in connection with bank robberies more generally).

The same analysis applies to the Felon in Possession charge pending against Gollahon in Count Five.  He used the same firearm during the armed bank robberies charged in Counts One and Three, and he brandished it during those robberies, as charged in Counts Two and Four. Further, the Indictment charges Gollahon with possessing the firearm on February 1, 2019, the date of the M&T Bank robbery, and the firearm was recovered from Gollahon's person during a frisk by law enforcement after the stop of the Monte Carlo.

Simply put, the Felon in Possession charges goes hand in hand with the Armed Bank Robbery charges, and the charges are properly joined.

### B.  Defendants Cannot Establish Prejudice Under Rule 14.

When joinder under Rule 8(a) is proper, "the defendant's only recourse is to convince the court that the charges should be severed under Rule 14—a difficult task." *United States v. Blair*, 661 F.3d 755, 770 (4th Cir. 2011) (citation omitted) (incidents where joinder of offenses is proper but severance is nevertheless required limited to "rare" case where joinder would "prevent the jury from making a reliable judgment about guilt or innocence").  "A defendant making a motion for severance pursuant to Rule 14 has the burden of demonstrating a strong showing of prejudice, and it is not enough to simply show that joinder makes for a more difficult defense." *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir. 1984) (internal citations omitted); *see also United States v. Mir*, 525 F.3d 351, 357 (4th Cir. 2008) (further describing that a party seeking severance has

"an uphill battle").

When offenses are properly joined under Rule 8(a), a court should grant severance under Rule 14 "only if there is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). A defendant must "establish that actual prejudice would result from a joint trial . . . and not merely that a separate trial would offer a better chance of acquittal." *United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995) (emphasis added).

Neither Tingler, nor Gollahon can meet this burden.  Tingler claims that he will be prejudiced if a jury hears evidence regarding his criminal record.  But the proper remedy for such a claim of prejudice is a limiting instruction—not severance.  *See, e.g.*, *United States v. Silva*, 745 F.2d 840, 844 (4th Cir. 1984) ("Any prejudicial effect of the necessary introduction of [a] defendant's past conviction can . . . be avoided by the use of a limiting instruction."); *Stokes*, 211 F.3d at 1042-43 (no prejudice from joinder of felon in possession count where stipulation provided only that defendant had been convicted of crime punishable by more than one year imprisonment and court gave limiting instruction).  Moreover, under *Old Chief v. United States*, 519 U. S. 172 (1977), the parties may stipulate that the Defendant was convicted of a felony, and the jury will hear no evidence concerning the nature of the prior felony or any factual details about it.  The Government is open to such a stipulation—further mitigating the risk of prejudice to Defendants.

Though Tingler claims that even with a limiting instruction, the jury will conclude that Mr. Tingler is more likely guilty of the armed robbery related charges because he has a criminal disposition, ECF No. 56 at 3, these are precisely the sort of "speculative allegations" that are insufficient to satisfy the actual prejudice standard.  *See United States v. Najjar*, 300 F.3d 466, 473 (4th Cir. 2002); *United States v. Becker*, 585 F.2d 703, 707 (4th Cir. 1978) ("Speculative allegations as to possible prejudice do not meet the burden of showing an abuse of discretion in

denying a motion for severance.").

Finally, even were the Court to grant the motion to sever, evidence relating to Tingler's and Gollahon's possession of firearms would still be admissible during a separate trial of Counts One through Four as evidence relating to armed bank robbery and his brandishing of the firearm. *See, e.g.*, *United States v. Foutz*, 540 F.2d 733, 736 (4th Cir. 1976) ("[W]here evidence of one crime is admissible at a separate trial for another, it follows that a defendant will not suffer any additional prejudice if the two offenses are tried together[.]"); *United States v. Page*, 657 F.3d 126, 132 (2d Cir. 2011) (no abuse of discretion in denying severance of felon-in-possession count where "there is a logical connection between the felon-in-possession count and the other charges, there is a similarity in the evidence necessary to prove the different charges, the trial court takes steps to limit the danger of prejudice and gives a proper limiting instruction, and the defendant is not substantially or unfairly prejudiced").

In sum, neither Tingler, nor Gollahon can show that severance is appropriate under either Rule 8(a) or Rule 14, and their motions should therefore be denied.

## IV. Motions To Sever Defendants.

 Defendant Tingler next moves to sever his co-defendants in this case (ECF No. 57), and Defendant Gollahon has adopted this motion (ECF No. 61).  The Court should deny these motions.

During his *Mirandized*, post-arrest interview, Adams confessed to participating in the armed robberies on January 23, 2019 and implicated Tingler and Gollahon.  Similarly, in Gollahon's *Mirandized*, post-arrest interview, he gave a statement implicating himself, Tingler, and Adams.  Tingler voluntarily waived his *Miranda* rights but ultimately declined to discuss either robbery, invoking his right to counsel.

Where, as here, defendants are properly joined under Federal Rule of Criminal Procedure 8(b), severance under Federal Rule of Criminal Procedure 14 is justified "only if there is a serious

risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. at 539.  The Fourth Circuit has held that "[a] defendant making a motion for severance pursuant to Rule 14 has the burden of demonstrating a strong showing of prejudice." *Goldman*, 750 F.2d at 1225 (citing *United States v. Niederberger,* 580 F.2d 63 (3d Cir. 1978)). The party moving for severance must establish that "actual prejudice would result from a joint trial, and not merely that a separate trial would offer a better chance of acquittal." *Reavis*, 48 F.3d at 767 (citations and internal quotations omitted).  Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief, if any, to the district court's sound discretion. *Zafiro*, 506 U.S. at 538.

### A.  The Defendants Were Properly Joined.

As an initial matter, Defendants were properly joined pursuant to Federal Rule of Criminal Procedure 8(b).  Specifically, Defendants are each charged in connection with their participation in armed bank robberies on January 23, 2019 and February 1, 2019 and therefore plainly "are alleged to have participated in . . . the same series of acts or transactions constituting an offense or offenses." Fed. R. Crim. P. 8(b).   This is precisely the sort of case in which co-conspirators should be tried together, since much of the evidence presented by the government in its case-in-chief will pertain to all of the defendants. *See, e.g.*, *Zafiro*, 506 U.S. at 537–38; *cf. United States v. Akinkoye*, 185 F.3d 192, 197 (4th Cir. 1999) ("Generally, we adhere to the rule that defendants charged with participation in the same conspiracy are to be tried jointly."); *United States v. Santoni*, 585 F.2d 667, 673 (4th Cir.1978) (a "series of acts or transactions" under Rule 8(b) "logically includes those transactions so interconnected in time, place and manner as to constitute a common scheme or plan").  Indeed, all three Defendants were involved in the planning and execution of the two charged robberies, the *modus operandi* of the robberies was nearly the same, and the robberies

occurred about a week apart in the same general location:  The Canton area of Baltimore City.  *See United States v. Davis*, Crim. No. DKC 11-0171, 2011 WL 6369253, at *3 (D. Md. Dec. 19, 2011) (three defendants properly joined where, among other things, all three were alleged to have committed crimes (robbery and larceny), the crimes occurred in same county less than a month apart, there was continuity in planning among the defendants, and the  *modus operandi* of the crimes was similar).  Thus, joinder was proper.

**B.  Any *Bruton* Problem Can Be Addressed In Ways Less Drastic than Severance.**

Defendant Tingler contends that severance would be required if the Government were to violate the Confrontation Clause of the Sixth Amendment, as construed in *Bruton v. United States*, 391 U.S. 123 (1968), by introducing a non-testifying co-defendant's statement or confession naming the defendant as a participant in the crime.

Should the government seek to introduce any post-*Miranda* statement of a non-testifying defendant, all references to non-testifying co-defendants will be sanitized through redaction. Indeed, the proper remedy for a potential *Bruton* violation is not to sever the trials of the defendants, but instead to edit or redact the testimonial statement in order to eliminate the Confrontation Clause problem.

As the Supreme Court held in *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), the Confrontation Clause is not violated when a non-testifying co-defendant's confession is redacted to eliminate any reference to the other co-defendant's existence.  Moreover, the Supreme Court has specifically held that there is no Sixth Amendment violation unless the confession sought to be introduced contains "facially incriminating statements," rather than merely statements which become incriminating when linked to other evidence.  *Richardson*, 481 U.S. at 208–09; *see also Akinkoye*, 185 F.3d at 197–98 (finding that when a non-testifying codefendant's statement is redacted and read into evidence such that the statements do not refer to the existence of the

defendant, severance is not required); *United States v. Cone*, 714 F.3d 197, 218 (4th Cir. 2013) (where defendant's name was replaced with "another individual" in co-defendant's statement, redaction was sufficient to protect defendant's Confrontation Clause rights, as the redacted statement did not facially implicate defendant, and the jury could only have connected defendant to the statement through the use of other evidence).

And though Tingler claims that redaction is insufficient to solve the *Bruton* problem because all three Defendants were arrested together after the February 1, 2019 robbery with the robbery proceeds, and the firearms used during the robberies, ECF No. 57 at 4, that is precisely the sort of evidence by which the jury would be permitted to link Tingler to any statement by Adams or Gollahon.   Confessions which only tend to incriminate the defendant when linked with other evidence at trial do not violate the Confrontation Clause.  *Richardson*, 481 U.S. at 208.

Simply put, both Adams' and Gollahon's statements can be redacted to eliminate any reference to non-testifying co-defendants.  As trial approaches, the Government will prepare a proposed redacted version of any statement it may seek to introduce at trial.  Moreover, the Court can and should give a limiting instruction as to any introduced statement.

The Government thus requests that the Court hold its ruling on this matter in abeyance until the Government has an opportunity to provide Tingler, Gollahon, and the Court with any proposed redacted statements that it intends to introduce at trial.  Rule 14(b) expressly provides for the Court to inspect, *in camera*, any redacted statement that the government wishes to use at trial, and a "motion to sever on *Bruton* grounds may be premature until the Rule 14(b) procedure has been used."  Wright & Miller, *Fed. Prac. & Proc. Crim.* § 224 (4th ed.); s*ee also United States v. Sattar*, 314 F. Supp. 2d 279, 317 (S.D.N.Y. 2004) (denying motion to sever in light of government's representation that it would produce a properly redacted version of a codefendant's statement to the defense and the court prior to trial).  That is precisely the tack the Court should take here, and

the motions should be denied as premature.

**V.     Gollahon's Motion To Suppress Statements Should Be Denied (ECF No. 60).**

Defendant Gollahon moves to suppress his statements to law enforcement on February 1, 2019, claiming that they were obtained in violation of *Miranda* and the Fifth and Sixth Amendments of the Constitution.  ECF No. 60 at 1-2.  This argument fails because Defendant's statements were made voluntarily after he was advised of his *Miranda* rights and signed a waiver acknowledging that he understood his rights and agreed to speak with law enforcement.

**A.  All Of Gollahon's Statements Were Knowingly And Voluntarily Made After He Was Advised Of And Waived His *Miranda* Rights.**

The Fifth Amendment privilege against self-incrimination provides that "[n]o Person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const., Amendment V.  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court established a prophylactic, procedural mechanism that safeguards a defendant's Fifth Amendment privilege when that defendant is subject to custodial interrogation.  Specifically, in *Miranda*, the Supreme Court held that before conducting a custodial interrogation of a suspect, law enforcement officials must inform the suspect, in substance, that he has the right to remain silent, that his statements may be used against him at trial and that he has the right to an attorney during questioning.  *Miranda*, 384 U.S. at 468-71.  Custody, therefore, is a *sine qua non* for the application for the application of *Miranda*.  *See, e.g.*, *Berkemer v. McCarty*, 468 U.S. 429, 440 (1984) (*Miranda* applies "as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest.") (citation and internal quotation marks omitted).

After a court determines whether *Miranda* applies to a case, or whether the case instead falls within an exception to *Miranda*, that court, in order to find that a statement is admissible at trial, must next find that the statement was voluntary and was not "coerced" from the defendant.

The Government must prove by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights.  *Miranda*, 384 U.S. at 475.  The test for determining whether a statement is voluntary "is whether the confession was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence."  *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (internal citations omitted).

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause."  *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  However, the "mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary."  *Braxton*, 112 F.3d at 780.  "The proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination critically impaired."  *Id.* (internal citations omitted).

This inquiry requires a consideration of the "totality of the circumstances" including (1) whether law enforcement officers properly advised the defendant of his right not to make any statements and of his right to have an attorney present; (2) whether the officers inappropriately told the defendant that he was legally obligated to speak with them; (3) whether the officers physically or verbally threatened the defendant; (4) whether the defendant appeared to be cooperative; (5) whether the defendant was misled by the officers into believing that his statements could not be used against him; and (6) whether the officers engaged in any violent behavior during their questioning of the defendant.  *See generally id.* at 781-85.

Here, as the recorded interview of Gollahon makes plain, Ex. 4 (Gollahon Statement), he made the statements in the interview with law enforcement voluntarily.  Gollahon was advised of his *Miranda* rights before the interview and, as Defendant's signed *Miranda* waiver makes clear,

he acknowledged that he understood his rights and agreed to speak with investigators voluntarily. *See* Ex. 5 (Gollahon *Miranda* Waiver).  Indeed, such "[w]ritten consent supports a finding that the consent was voluntary.  Consent given while in custody may still be voluntary."  *Boone*, 245 F.3d at 362.

Furthermore, at no time did Gollahon invoke his right to counsel or to terminate the interview.  Nor was he ever told that he was obligated to speak with the investigators.  At no time were any threats, coercion or promises made to Gollahon in an effort to illicit the statements. Furthermore, Gollahon was cooperative during the interview.  Gollahon's statements were knowingly and voluntarily made. Accordingly, the Court should deny Gollahon's motion to suppress his statements to law enforcement.

## CONCLUSION

For all of the foregoing reasons, the Government respectfully requests that the Court deny Defendants' motions.

Respectfully submitted,

Robert K. Hur
United States Attorney

By:       _____/s/_____

Paul A. Riley
Daniel A. Loveland, Jr.
Assistant United States Attorneys